UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM POTTHOFF,

    Plaintiff,

v.

UNUM LIFE INSURANCE
COMPANY OF AMERICA, et al.,

    Defendants.
_____/

Case No. 1:24-cv-991

Hon. Paul L. Maloney

## OPINION

Now before the Court is Plaintiff William Potthoff's Motion for Judgment on the Administrative Record and for Declaratory Relief (ECF No. 21).  The Court has reviewed the parties' briefings and over five thousand pages in the administrative record.  For the reasons that follow, the Court will grant Potthoff's motion.

### I. BACKGROUND

Plaintiff William Potthoff worked as a general and vascular surgeon for over twenty-five years in Traverse City, Michigan.  For most of his career, he suffered from back pain.  In January 2018 his clinic closed, and Potthoff started to look for a new job.  But seven months into his search, his back pain worsened to the point where he could no longer work, and so he applied for total disability benefits.  Up until that point, Potthoff only received residual disability benefits because, although he could still perform surgery, his doctors recommended that he work at a reduced schedule.

Unum and Provident insure Potthoff for occupational disability.[1] They granted his application for total disability, but they categorized his back pain as a result of "sickness" instead of "injury." Back pain from "sickness" only entitled Potthoff to forty-two months of total disability given that the disability began between his sixty-second and sixty-third birthday. Back pain from an "injury" would have entitled him to benefits for the rest of his life.

Unum and Provident had never determined the exact cause of Potthoff's back pain when he received residual benefits: they did not need to. Residual benefits would have paid out until Potthoff's sixty-fifth birthday regardless of the cause. So when Potthoff applied for total disability, Unum and Provident needed to determine—for the first time—a cause: injury or sickness. (*See* Admin. Rec. Ex. B14 235, ECF No. 12-15.)

The policy defines "sickness" as a "sickness or disease which is first manifested while [the] policy is in force," and an "injury" as an "accidental bodily injur[y] occurring while [the] policy is in force." (Corr. Mot. for J. Ex. 2 14, ECF No. 12-3.) If a disability is caused by both an injury and a sickness, then the insurer pays according to whichever cause gives the greater benefit.[2] (*Id.* at 16, 20.)

---

[1] It is not always clear from the record which defendant—Provident or Unum—is administering the claims. Sometimes the companies share their names in letterhead and other times the letterhead might name one defendant while the letter itself refers to actions taken by another. The Court has done its best to identify the specific party when possible, but its decision to attribute an action to a given party should not be understood as an official finding of fact. These attributions are instead only a shorthand for actions taken by whichever defendant seems to be administering Potthoff's claims in a given moment.

[2] This language is the same for residual and total disability. Specifically, the policy says:

> In no event will you be considered to have more than one disability at the same time. The fact that a disability is caused by more than one Injury or Sickness or from both will not matter. We will pay you benefits for the disability which provides the greater benefit.

(Corr. Mot. for J. Ex. 2 16, 20.)

Potthoff first sought treatment for back pain in February 1995.[3] One morning, he woke up with severe back pain after turning in bed, so he decided to go to the hospital. (Admin. Rec. Ex. B1 119, ECF No. 12-2.) Potthoff denied any medical or family history of back pain except for his older brother, who also suffered from it.[4] (*Id.* at 119.) An MRI revealed "no fractures" and a "moderate sized left sided L5-S1 disc herniation." (*Id.* at 111.) There was no evidence of an extruded fragment. (*Id.*) Over the next year, Potthoff was able to return to work at a full-time capacity through a combination of rest and medication. (Admin. Rec. Ex. B3 52, ECF No. 12-4.)

Potthoff sought treatment for his back a second time in December 1996. Once again, he had woken up with back pain. (Admin. Rec. Ex. B2 150, ECF No. 12-3; Admin. Rec. Ex. B1 112.) But this time, he had slipped and fallen a few weeks earlier. The attending physician, Dr. Vincent Prusick, noted:

> Dr. Potthoff is in for evaluation of his back and left leg sciatica. This has been an ongoing problem of two weeks['] duration. It apparently came without any distinct precipitating episode *although he had had some minor injuries such as a slip and fall on ice about a week before that.* He had been having some low-grade problems with his back over the preceding two weeks. He had a difficult time [ ] even operating last week, [and,] therefore, he has canceled much of his operative schedule.

(Admin. Rec. Ex. B1 112 (emphasis added).)

---

[3] Some medical records say that Potthoff first began to have back pain a year earlier in 1994. (*See* Admin. Rec. Ex. B18 250, ECF No. 12-19 (collecting references to back pain in 1994).) The most convincing example is from Potthoff's 1997 visit with Dr. Richard Ball, where Dr. Ball describes in his notes that Potthoff's condition began without a "clear-cut precipitating event" after a severe episode of pain in 1994, the year before Potthoff first sought treatment. (Admin. Rec. Ex. B3 56.) The parties argue over the meaning of this note. But its importance is discounted by the fact that there are no records that Potthoff ever sought treatment for back pain in 1994.

[4] Potthoff elaborates on his family history in his affidavit: "[W]hile I have had family members who have suffered traumatic back injuries, I have no family history of disc sickness or disease. I had one brother who suffered disc rupture while parachuting as a Green Beret and another brother who suffered a disc injury while lifting heavy industrial equipment." (Admin Rec. Ex. B17 293 ¶ 10, ECF No. 12-18.)

Potthoff had another MRI. Dr. Prusick noted that there did not appear to be any signs of free fragments. (*Id.*) The radiologist compared this MRI to the one a year earlier. According to their notes, there were "some degenerative changes" but his herniated disc was "less pronounced," suggesting "some interval healing." (Admin. Rec. Ex. B2 at 130.)

Potthoff rested and returned to work at a reduced schedule as recommended by Dr. Prusick. Potthoff applied for residual disability benefits in light of his reduced schedule. In his application, he listed the cause of disability as an "accident." (Admin. Rec. Ex. B2 181). Dr. Prusick signed a statement in support of Potthoff's application. In it, he said Potthoff suffered from a "lumbar disc herniation" and that his back pain developed "spontaneous[ly]." (*Id.* at 184).

An insurance agent first reported the claim to Provident as a "back injury." (*Id.* at 190.) A few weeks later, a claims representative called Potthoff to discuss his claim. The claims representative asked Potthoff if he agreed that his condition was more likely a result of sickness than an accident:

> He states there was not an acute episode on 12/12/96 and agrees this is due to a degenerative process which began approximately 2 years ago for which he received NDI benefits. He was not sure how to respond on the form. *He did agree the sickness provision is more appropriate.* In 12/96 he had been having acute back pain which was not unusual. However, on Monday 12/9/96 he woke up with increased pain.

(*Id.* at 179 (emphasis added).) Still, there is no official determination in the record at this point whether Potthoff qualified for residual benefits as a result of "injury" or "sickness."

Potthoff began to receive residual benefits in December 1996. Two years later, Provident stopped making payments. According to Provident, Potthoff was able to work at

4

full capacity, but he chose not to. Potthoff appealed Provident's decision. During the appeal, Dr. Prusick responded to questions from Provident, describing Potthoff's condition as "chronic low back pain[, which] is typical of degenerative disc disease and prior disc herniation." (Admin. Rec. B1 107.)

When Provident affirmed its denial of residual benefits, Potthoff sued Provident in federal court and won. *Potthoff v. Provident Life & Accident Ins. Co.*, No. 1:00-CV-823, slip op. (W.D. Mich. Feb. 8, 2001). In that case, Provident further explained that it terminated Potthoff's benefits because, based on his medical history and ability to play golf and tennis, he should have been able to work without a reduced schedule. *Id.* at 3-4. The court held that this was an unreasonable interpretation of the evidence, and reversed Provident's decision. *Id.* at 7. It did not make any findings related to the cause of Potthoff's disability.

While Potthoff appealed his denied residual benefits, he had surgery—a lumbar microdiscectomy to alleviate nerve root tension in the L5-S1 region. The surgeon, Dr. Prusick, found and removed numerous fragmented disc pieces. The nerve itself, he described in his notes, had a "reddish bluish appearance" from excessive compression. (Admin. Rec. Ex. B3 127.) Although Provident had denied Potthoff residual benefits before his surgery, he did receive total disability benefits right after surgery and then residual benefits when he returned to work at a reduced schedule while recovering. (Admin. Rec. Ex. B18 156; Admin. Rec. Ex. B5 67, ECF No. 12-6.)

After he won his lawsuit, Potthoff received retroactive benefits and became eligible to receive residual disability, which he kept for sixteen more years. To maintain his eligibility,

Dr. Prusick continued to provide statements to Provident in support of Potthoff's benefits, assigning him a primary diagnosis of degenerative disc disease. (Admin. Rec. B10 143, ECF No. 12-11; Admin. Rec. Ex. B11 48, ECF No. 12-12.) Some months, however, his salary exceeded the twenty-percent income-loss required to receive those benefits. (Admin. Rec. Ex. B11 16, 94, 169.)

Potthoff's condition began to worsen in 2013. In April of that year, Potthoff explained to a benefits specialist that he now had four degenerative discs. (Admin. Rec. Ex. B10 123, ECF No. 12-11.) A year later, Potthoff told the specialist that he started to feel like he had slowed down in his work because of his degenerative disc disease. (Admin. Rec. Ex. B11 23, 46.)

Potthoff's practice closed in January 2018. He visited Dr. James MacKenzie a few weeks later. Dr. MacKenzie noted that Potthoff continued to struggle with "chronic progressive low back pain" and lumbosacral spondylosis. (Admin. Rec. Ex. B13 34, ECF No. 12-14.) Several months later, Potthoff had another MRI and x-ray in preparation for a second back surgery. Dr. Prusick noted degenerative disc changes and a narrowing at L5-S1. (*Id.* at 2.)

Potthoff applied for total disability in July 2018. In response, Unum granted Potthoff's application, but only under the sickness provision of the policy. (*Id.* at 128.) Three of Potthoff's doctors (Burke, MacKenzie, and Lamie) sent a note on his behalf explaining that his disability resulted from an injury, not sickness. (Admin Rec. Ex. B17 289.)

6

Unum then hired two physicians to review Potthoff's medical records to determine the cause of his condition. Neither physician referenced the December 1996 slip-and-fall in their analysis. Instead, they focused on how the February 1995 pain came after Potthoff had turned in bed. This focus was at least supported by a phone call between Unum's first physician, Dr. Antaki, and Dr. Burke. In Dr. Antaki's notes, he reports that Dr. Burke said that Potthoff's disability started with a disc-herniation injury in 1995. (Admin. Rec. Ex. B14 152.) Given this information and Potthoff's medical records, Dr. Antaki concluded that Potthoff's condition was a result of progressive degenerative disc disease. (*Id.* at 163-165.) Unum's second physician, Dr. Aron, agreed with Dr. Antaki. (*Id.* at 229-230.) In September 2019, Unum notified Potthoff of its review and determination that his disability was a result of sickness. (Admin Rec. Ex. B17 289-290.)

Potthoff appealed Unum's decision.[5] His appeal included affidavits from four of his treating physicians (Prusick, MacKenzie, Lamie, and Burke) and a non-treating physician (Best). (Admin. Rec. Ex. B15 271-73, ECF No. 12-16 (Lamie); Admin. Rec. Ex. B16 129-43, ECF No. 12-17 (Best); Admin. Rec. Ex. B17 298-302 (Prusick); Admin. Rec. Ex. B18 74-75 (Burke), 218-19 (MacKenzie).) The treating physicians agreed that the back pain was a result of the slip-and-fall. *See generally id.* Dr. Prusick explained that the disc fragments that he removed during Potthoff's 1999 surgery were more consistent with signs of traumatic injury than degenerative disease. (Admin. Rec. Ex. B17 300-01.) And at any rate, the term

---

[5] Unum failed to notify Potthoff of his right to appeal its decision under the Employee Retirement Income Security Act (ERISA). It was not until 2023 that Potthoff contacted Unum to make them aware of this failure. (Admin. Rec. Ex. B15 123.) Once Unum notified him, Potthoff then appealed its decision.

"degenerative disc disease," he explained, is an umbrella term for conditions that are the result of both injury and sickness—not just sickness. (*Id.* at 301.)

Drs. Prusick, Lamie, Burke, and Best also acknowledged the role that repetitive stress injuries played in contributing to Potthoff's condition. (Admin. Rec. Ex. B15 271-73; Admin. Rec. Ex. B16 129-137; Admin. Rec. Ex. B17 298-302; Admin. Rec. B18 75-76.) They explained that Potthoff experienced repetitive stress injuries through decades of performing surgery as part of his high-volume practice. The record includes a series of studies about the effect of repetitive stress injuries on surgeons. (Admin. Rec. Ex. B16 144-73.)

Unum hired Dr. Norris to review the doctors' affidavits alongside Potthoff's medical records. Unlike Unum's previous reviewers, Dr. Norris mentioned the December 1996 slip-and-fall. In his note, Dr. Norris explained that the symptoms that Potthoff reported after the slip-and-fall were delayed symptoms of his back pain from turning in bed almost two years earlier in February 1995. (Admin. Rec. Ex. B18 158.) Potthoff's turning in bed, he explained, was not so major as to provoke a herniated disc without the presence of some degenerative disc disease. (*Id.*)

Unum told Potthoff that it planned to revise its decision according to Dr. Norris's report. It offered Potthoff an opportunity to respond to his analysis before it made its decision. (Admin. Rec. Ex. B18 176-77.)

Potthoff submitted supplemental affidavits from his physicians. Drs. MacKenzie, Lamie, and Best concurred with Dr. Prusick's observation that the presence of disc fragments and bruised nerve roots during the 1999 surgery was more consistent with an injury than with

8

degenerative disc disease. (Admin. Rec. Ex. B7 11-17, ECF No. 12-8.) In addition, Dr. Burke responded to Unum's characterization of his conversation with Dr. Antaki during its first review:

> From what I can now recall of my conversation with Unum, the cause factor of Dr. Potthoff's back condition was not extensively discussed as much as his occupation restrictions and limitations. Had the question posited [been] what impact Dr. Potthoff's initial slip and fall in 1996 had on disability, I would have informed Unum that, more likely than not, this was the precipitating event and that his condition worsened following that initial disabling event.

(*Id.* at 9.)

Despite the supplemental evidence, Unum affirmed its earlier decision. In a letter explaining its rationale, Unum summarized various parts of the record. Although the letter acknowledged Potthoff's slip-and-fall and repetitive stress injuries, it did not explain how these considerations affected its decision. Instead, Unum cited to repeated mentions of degenerative disc disease in the medical records. It did not address Dr. Prusick's use of this diagnosis as an umbrella term for treating both injury- and sickness-induced back pain.

This lawsuit followed Unum's denial of Potthoff's appeal. Potthoff sued Provident and Unum under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(b). (Compl. 17, ECF No. 1.) He claims he is entitled to past and future total disability benefits under the injury provision of his policy. (*Id.* at 20.) And now he moves for judgment on the administrative record and for declaratory relief. (ECF No. 21.) Provident and Unum oppose the motion. (ECF No. 19.)

## II. LEGAL STANDARD

The parties agree that the de novo standard applies to this case. A court reviews a plan administrator's decision de novo unless the plan gives the administrator discretionary

9

authority. *Tranbarger v. Lincoln Life & Annuity Co. of New York*, 68 F.4th 311, 314 (6th Cir. 2023). If it does not, no deference is given to the plan administrator's factual or legal conclusions. *Rowan v. Unum Life Ins. Co. of Am.*, 119 F.3d 433, 435 (6th Cir. 1997). The ultimate question then is whether "the administrator or fiduciary made a correct decision." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir.1990). To answer that question, "the district court must take a 'fresh look' at the administrative record" but it "may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 616 (6th Cir. 1998). It is the plaintiff's burden to prove by a preponderance of the evidence that they are entitled to the benefits they seek. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgt. or LBA Employees*, 741 F.3d 686, 700-01 (6th Cir. 2014) (collecting cases).

### III. DISCUSSION

#### A. Denial of Benefits

##### 1. What causation analysis is required under the policy?

In his motion, Potthoff argues that the only cause that should matter for his total disability claim is the original cause of his residual disability. He relies on Defendants' use of the term "etiology," which means "cause or origin." *Etiology*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/etiology. Given their use of the term, he argues, the cause of his total disability must be the *first* "cause" or "origin" of his disability *in general*, which he argues was the 1996 slip-and-fall. The term "etiology" does not appear in the policy, only in Defendants' communications about Potthoff's total disability claim.

Although it is possible that the slip-and-fall contributed to his total disability, there is nothing in the policy that requires the insurer to attribute the cause of one type of disability to a different one.  Under the policy, the insured is entitled to covered losses "resulting from" sickness or injury.  (Corr. Mot. for J. Ex. 2 10.)  The insured is responsible for proving the cause of their disability for each covered loss.  And a loss for "total disability" is different from a loss for "residual disability."[6] (*Id.* at 14.)  So the proof-of-cause required for each type of disability claim is different too.  In other words, Potthoff cannot rest on the laurels of his injury-induced residual disability claim to show causation for his total disability claim twenty years later.[7]

### 2. Did Potthoff's slip-and-fall cause his total disability?

So the question now is whether Potthoff's slip-and-fall in 1996 caused his total disability in 2018.  At the outset, the court discounts certain evidence in its analysis.  Pre-2018 communications between Potthoff and Defendants about the cause of his 1996 residual disability, for example, are not helpful because they lack stakes: Potthoff would receive the same amount each month regardless of the cause, and there was never an official determination one way or the other for him to challenge.

---

[6] As mentioned earlier, the cause of a disability only matters for total disability claims, not residual disability claims. And while an insured that is totally disabled cannot "perform the substantial and material duties of [their] occupation," (Corr. Mot. for J. Ex. 2 14), an insured that is residually disabled is only unable to perform some of those duties or at least needs more time to do them, (*id.* at 19).

[7] Potthoff also argues, based on the elimination period in the policy, that Defendants waived their right to determine the cause of Potthoff's total disability.  But the elimination period does not create any requirement for Defendants to determine a cause of disability in that timeframe.  So this argument fails.  He also argues that the fact that he received total benefits after his 1999 surgery entitles him to receive lifetime total benefits.  While the policy does allow lifetime benefits for total disabilities starting before the age of sixty, the total benefits that Potthoff received in 1999 were caused by his surgery, and, therefore, a different covered loss than the total disability he claimed in 2018, which was caused by something else.

11

The most convincing evidence for causation comes from Potthoff's treating physicians. They explain that the large disc fragments and nerve discoloration discovered in 1999 were signs of a traumatic back injury, like a slip-and-fall. Defendants note that there were no signs of disc fragments in the 1996 MRI. It is not clear whether Dr. Prusick missed signs of disc fragments or if the fragments were a delayed symptom. Dr. Prusick also explains that his repeated use of "degenerative disc disease" over the years was an umbrella term, meant to encompass both injury- and sickness-induced disabilities. Defendants do not challenge Dr. Prusick's characterization, but they use the term itself to support their use of the policy's "sickness" provision.

Defendants' Dr. Norris tells a different story from Potthoff's physicians. In it, the cause of Potthoff's residual disability was a bad back. Potthoff herniated a disc just by turning in bed in February 1995. According to Norris, it was only a matter of time before he experienced those symptoms again, as he did in December 1996.

Setting aside whatever caused Potthoff's residual disability, there is not enough evidence in the record to prove, more likely than not, that the slip-and-fall caused his total disability. There are more than twenty years between these events and no evidence to explain how the slip-and-fall would have caused total disability in the way it did when it did. To the extent that it may have been a cause among multiple causes, Potthoff would be entitled to receive benefits. But there is not enough evidence to support that conclusion.

### 3. Did Potthoff's repetitive stress injuries cause his total disability?

As mentioned earlier, the policy defines "injury" as an "accidental bodily injur[y]." (Corr. Mot. for J. Ex. 2 14.) The parties disagree whether the policy covers repetitive stress injuries under this definition.

Defendants argue that the Court should use the definition of "accidental bodily injury" as it appears in *King v. Pennsylvania Life Ins. Co.*, 470 F. App'x 439 (6th Cir. 2012). (Response 15-16.) In that unpublished case, the Sixth Circuit applied Michigan law to construe "accidental bodily injury" in a given policy to mean "physical damage to the body caused by an external, violent, unanticipated cause that is neither clearly medical nor biological." *King*, 470 F. App'x at 444.

But unlike the panel in *King*, courts in ERISA cases follow the federal common law—not state law. The primary ambiguity in the policy's definition of "injury" is its use of the term "accidental." The term "accidental" is undefined in the contract. When "accidental" is undefined, the Sixth Circuit has applied the First Circuit's test to determine what activity is accidental under the policy. *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 336-37 (6th Cir. 2009). Under that test, courts must ask "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* at 337 (quoting *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077, 1088 (1st Cir.1990)). In practice, this test means that courts must assess the insured's subjective intentions and objective expectations:

> If the insured subjectively intended to cause himself injury or death when engaging in a voluntary act, then there is no "accident" under the ordinary meaning of that term. But in cases where the insured intended the act but "did not intend the harm that befell him, 'the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable.'" As the *Kovach* Court explained, that inquiry requires the court to ask, "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." The *Kovach* Court quantified the *Wickman* rationale, declaring that "highly likely" must mean more than a 50% possibility; instead, "one might contemplate a 75% or higher probability before the average person would be persuaded that [an injury] was 'highly likely' to occur."

*Jessen v. CIGNA Group Ins.*, 812 F. Supp. 2d 805, 816 (E.D. Mich. 2011) (citations omitted).

Courts in the Sixth Circuit have so far only applied this test to accidental death policies. *See, e.g., Smith v. Metro. Life Ins. Co.*, 260 F. Supp. 3d 888 (E.D. Mich. 2017) (analyzing whether insured's ingestion of washer fluid was accidental); *Jessen v. CIGNA Group Ins.*, 812 F. Supp. 2d 805 (E.D. Mich. 2011) (assessing whether insured's heroin overdose was accidental). In at least two cases, district courts in circuits that have adopted the First Circuit's test have applied the same standard to occupational disability policies where repetitive stress injuries at work led to the insured's disability. *E.g., Stein v. Paul Revere Life Ins., Co.*, 661 F. Supp. 3d 378, 389-90 (E.D. Pa. 2023); *Chapman v. Unum Life Ins. Co. of Am.*, 555 F. Supp. 3d 713, 722 (D. Minn. 2021). Defendants are correct that *Chapman* and *Stein* are not binding—but these cases are persuasive. There is no other reason that the Sixth Circuit would limit its use of the First Circuit's test only to accidental death policies, and Defendants offer no arguments otherwise.

14

Like the doctors in *Stein* and *Chapman*, the record here does not reflect Potthoff's subjective expectations about his injury. Instead, the courts there looked to whether a reasonable person in the insured's position (here, a reasonable general and vascular surgeon) with the insured's same knowledge and experience might know or reasonably believe about whether developing their condition (like degenerative disc disease) is "highly likely." *Stein*, 661 F. Supp. 3d at 390; *Chapman*, 555 F. Supp. 3d at 722.

In this case, a reasonable person in the same position as Potthoff would not believe that there was a high likelihood that his work would lead to total disability. Indeed, Potthoff's treatment history is replete with references to degenerative disease as the cause of his illness, not repetitive stress injuries. The record also contains multiple articles discussing the relationship between back pain and performing surgery—all published after Potthoff applied for total disability in 2018. (*E.g.*, Admin. Rec. Ex. B11 169-70, 172-73, 145-50.) And although some of these risks could have been known to Potthoff during his working years, there is nothing in the record to reflect that a reasonable surgeon would have been aware of how his or her work affected his or her wellbeing in this way. At the very least, the medical community's understanding of the risks that accompany performing surgery is still evolving. So it is also reasonable that Potthoff would not have known about the risk of repetitive stress injuries. Potthoff's repetitive stress injuries are therefore "accidental."

Defendants do not argue that Potthoff's condition was not a "bodily injury." Indeed, these terms seem to be unambiguous. If the federal common law were required here to resolve ambiguity, courts have referenced state law principles to construe repetitive stress injuries as "bodily injuries." *See, e.g.*, *Stein*, 661 F. Supp. 3d at 390 (citing *Coregis Ins. Co.*

15

*v. City of Harrisburg*, 401 F. Supp. 2d 398, 404 (M.D. Pa. 2005)) (applying Pennsylvania law); *Chapman*, 555 F. Supp. 3d at 722 (citing *Provident Life & Accident Ins. Co. v. Hallum*, 276 Ga. 147, 576 S.E.2d 849 (2003)) (applying Georgia law). To the extent Defendants still argue that Michigan law should still apply, the definition used in *King* only defines "bodily injury" to mean "damage to the body." *King*, 470 F. App'x at 444. Repetitive stress injuries meet this definition.

Because the policy covers repetitive stress injuries under its "injury" provision, the next question is whether Potthoff's work caused repetitive stress injuries that contributed to his total disability. Three of Potthoff's treating physicians indicate that it did. In his affidavit, Dr. Prusick describes Potthoff's practice as "busy" and "high production," requiring him to "stand[] in a contorted position, sometimes up to twelve hours a day," leading to repetitive injury. (Admin. Rec. Ex. B17 300-01 ¶¶ 22, 27.) Dr. Lamie agrees and adds that there is a "repetitive nature" to Potthoff's practice that led to his injury. (Admin. Rec. Ex. B15 272 ¶ 16.) Both physicians also note that other, alternative causes, such as a family history of back pain, do not apply to Potthoff. (*Id.* at 272 ¶ 11; Admin. Rec. Ex. B17 300 ¶ 25.) Dr. Burke repeats this same level of analysis in his affidavit. (Admin. Rec. Ex. B18 74-75.)

Dr. Best analyzes causation in greater detail. He explains that surgeons suffer from a high rate of back pain, and that studies have shown that "a mere bending at 30 degrees doubles the amount of pressure within the disc." (Admin. Rec. Ex. B16 135-36 ¶¶ 40, 49, ECF No. 12-17) And as a vascular surgeon, he explains, that pressure was compounded by Potthoff's wearing a lead vest to prevent exposure to radioactive material. (*Id.* at 136 50.) Best also mentions that Potthoff had to wear loupes, (*id.* at 315 ¶ 45), which can increase

16

time in "ergonomically unfavorable positions," (*id.* at 172.) Studies in the record also show that, while surgeons in general often suffer from neck and back pain because of their work, (*id.* at 169), vascular surgeons in particular are susceptible to these outcomes, (*id.* at 146-49) (describing the physical demands of certain types of vascular surgery and the pain rates among vascular surgeons compared to surgeons in other practices). Defendants do not challenge any of the studies or affidavits in the record.

Given the evidence in the record about Potthoff's practice and the studies concerning back pain among surgeons, it is more likely than not that Potthoff's total disability was a result of repetitive stress injuries, which are covered under the "injury" provision of his occupational disability policy.

### B. Remedy

At different points in his motion, Potthoff seems to request both remand and any payments for total disability to which he is entitled. (*Contrast* Corr. Mot. for J. 2 (requesting the Court order retroactive benefits and restoration of Potthoff's ability to receive lifetime benefits according to the terms of the policy) *with* (Corr. Mot. for J. 32) (describing how remand is appropriate for a benefits claim when benefits were improperly terminated).)

Remand would be appropriate here if Defendants' decision suffered from a procedural defect or if the administrative record was factually incomplete. *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir. 2009). Failure to notify the insured of an appeal under ERISA is a procedural defect, but it was one that Defendants were able to fix in this case without court intervention.

An award of benefits is more appropriate. The record here clearly establishes that Potthoff is totally disabled. There is no evidence in the record to support Defendants' decision to deny

17

Potthoff total benefits under the injury provision as a result of repetitive stress injuries. *See id.* Defendants have already had an opportunity to respond to Potthoff's claim for relief on this theory. And so they are not entitled to a "second bite at the apple" during remand. *Id.* at 374.

### C. Attorney's Fees

Potthoff requests a separate hearing so that he may request additional relief under ERISA Section 502(g), 29 U.S.C. § 1132(g), including interest, costs, and attorney's fees. If the parties are unable to reach an agreement, Potthoff may file an appropriate motion for interest, fees and costs. The court declines to order a hearing prior to the filing of a motion.

## IV. CONCLUSION

For the reasons provided, the Court will grant Plaintiff William Potthoff's motion for judgment and declaratory relief (ECF No. 21).

The Court will enter an order consistent with this Opinion.

Date:  January 22, 2026            /s/ Paul L. Maloney
                                   PAUL L. MALONEY
                                   UNITED STATES DISTRICT JUDGE